## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JASON SARKIS, | ) |
| | ) |
| Plaintiff, | ) Case No. _____ |
| | ) |
| v. | ) JURY TRIAL DEMANDED |
| | ) |
| THESTREET, INC., DAVID CALLAWAY, JAMES J. CRAMER, BOWERS W. ESPY, SARAH FAY, LAWRENCE S. KRAMER, BETSY L. MORGAN, KEVIN RENDINO, and STEPHEN R. ZACHARIAS, | ) ) ) ) ) ) |
| Defendants. | ) ) |

## **COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

## **NATURE OF THE ACTION**

1. This is an action brought by Plaintiff against TheStreet, Inc. ("TheStreet" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with TheStreet, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in connection with Euromoney Institutional Investor PLC's ("Euromoney") proposed acquisition of TheStreet's business-to-business, or B2B, content and products, which includes The Deal and BoardEx (the "B2B Business") (the "Proposed Transaction").

1

2.     On December 6, 2018, TheStreet entered into a Membership Interest Purchase Agreement (the "Purchase Agreement"), pursuant to which Euromoney will acquire TheStreet's B2B Business for $87.3 million in cash, subject to adjustment, including based on the working capital, cash and outstanding indebtedness of the B2B Business as of the closing of the transaction (the "Purchase Consideration").  The transaction will be structured as a purchase by Euromoney of all the membership interests of The Deal, L.L.C., a Delaware limited liability company and wholly owned subsidiary of TheStreet.

3.     Additionally, and in connection with the Proposed Transaction, TheStreet's Board has recommended an amendment to TheStreet's restated certificate of incorporation to effect a Reverse Stock Split of TheStreet's common stock (the "Reverse Stock Split Proposal") and the approval of the compensation that may be paid or become payable to certain of TheStreet's named executive officers as a result of consummation of the Proposed Transaction (the "Transaction-Related Compensation Proposal").

4.     Upon closing of the Proposed Transaction, TheStreet's business will undergo significant changes as its post-closing operations will be reduced to consist solely of its business-to-consumer content and products ("B2C Business").  While the B2B Business comprises half of TheStreet's current revenues and assets, given the size of the Purchase Consideration relative to TheStreet's current market capitalization, the Proposed Transaction may constitute the sale of substantially all of TheStreet's property and assets under Section 271 of the DGCL.

5.     On December 31, 2018, in order to convince TheStreet's public common shareholders to vote in favor of the Proposed Transaction, the Reverse Stock Split Proposal, and the Transaction-Related Compensation Proposal, Defendants authorized the filing of a materially incomplete and misleading Preliminary Proxy Statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

6. In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for TheStreet; and (ii) the valuation analyses performed by TheStreet's financial advisor, Moelis & Company LLC ("Moelis").

7. The special meeting of TheStreet's shareholders to vote on the Proposed Transaction and other transaction-related proposals is expected in the first quarter of 2019 and consummation of the Proposed Transaction will follow thereafter (the "Shareholder Vote"). It is therefore imperative that the material information that has been omitted from the Proxy is disclosed prior to the Shareholder Vote so TheStreet shareholders can properly exercise their corporate voting rights.

8. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to TheStreet's public common shareholders sufficiently in advance of the upcoming shareholder vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

7. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

8. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the

[Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

9. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, TheStreet's principal executive offices are located in this District and TheStreet's common stock trades on the Nasdaq stock exchange, which is also headquartered in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

10. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of TheStreet common stock.

11. Defendant TheStreet is a public company incorporated under the laws of Delaware with principal executive offices located at 14 Wall Street, 15th Floor, New York, New York 10005. TheStreet's common stock is traded on the Nasdaq under the ticker symbol "TST."

12. Defendant David Callaway is, and has been at all relevant times, a director of the Company. Defendant Callaway also serves as the CEO and President of the Company.

13. Defendant James J. Cramer is, and has been at all relevant times, a director of the Company. Defendant Cramer is also the founder of the Company and serves as a Markets Commentator.

14. Defendant Bowers W. Espy is, and has been at all relevant times, a director of the Company.

4

15. Defendant Sarah Fay is, and has been at all relevant times, a director of the Company.

16. Defendant Lawrence S. Kramer is, and has been at all relevant times, a director of the Company.

17. Defendant Betsy L. Morgan is, and has been at all relevant times, a director of the Company.

18. Defendant Kevin Rendino is, and has been at all relevant times, a director of the Company.

19. Defendant Stephen R. Zacharias is, and has been at all relevant times, a director of the Company.

20. The defendants identified in paragraphs 12 through 19 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with TheStreet, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and the Proposed Transaction**

21. TheStreet is a financial news and information provider focusing on B2B and B2C content and products which provide institutional investors, advisors and dealmakers with actionable information from the worlds of finance and business. The Company operates through three business units:[1] (i) TheStreet.com, (ii) The Deal, and (iii) BoardEx. The Deal and BoardEx units make up the Company's B2B Business while the B2C Business consists of TheStreet.com. TheStreet.com is the Company's namesake website which includes free content and houses subscription products that serve varying segments of the retail investing public. The Deal delivers actionable, intraday coverage on changes in corporate control, including mergers and acquisitions, private equity, corporate activism and restructuring. With an institutional license, users receive full access to proprietary commentary, analysis and data produced by the Company's journalists, and content feeds

---

[1] In or about June 2018, the Company sold its RateWatch business to S&P Global.

can be customized based on job function or deal focus. BoardEx is a relationship capital management service and source of data and business intelligence for investment banks, consultancies, executive search firms, law firms and universities.

22. On December 6, 2018, the Board caused the Company to enter into the Purchase Agreement with Euromoney.

23. Pursuant to the terms of the Purchase Agreement, Euromoney, upon the terms and subject to the conditions set forth in the Purchase Agreement, will acquire TheStreet's B2B Business for $87.3 million in cash.

24. According to the December 6, 2018 press release announcing the Proposed Transaction:

> TheStreet, Inc. (Nasdaq: TST), a leading financial news and information company, today announced that it has entered into a definitive purchase agreement (the "Agreement") to sell its institutional business units, The Deal and BoardEx (the "B2B Business"), for $87.3 million to Euromoney Institutional Investor PLC ("Euromoney"), the global business information and events group. The Agreement was unanimously approved by TheStreet's Board of Directors (the "Board") upon recommendation of the special committee of independent directors. The decision to sell the institutional business is part of the Board's ongoing review of strategic alternatives to enhance shareholder value.
>
> The Company expects that a substantial portion of the net proceeds from the sale will be distributed to TheStreet's stockholders. The Board is evaluating the various ways to complete this distribution, including, among other factors, the timing and amount of such distribution.
>
> "The primary goal of our Board and management team has always been to maximize shareholder value, and the sale of our B2B business to Euromoney is a unique opportunity to do just that," said David Callaway, President and Chief Executive Officer. "Our Board decided this was the best path to maximize value following our recent sale of RateWatch."
>
> The Deal and BoardEx, which reported revenue of $23.8 million in 2017, has offices located in New York, London, Wisconsin, Washington DC, San Francisco and Chennai, India. TheStreet acquired The Deal in 2012 and BoardEx in 2014.
>
> Following the close of the sale of the B2B Business, the Company will

continue to execute on its business plan of providing exceptional coverage of the financial markets with a focus on subscription revenue. The Company's consumer businesses, led by its namesake website, TheStreet.com, houses premium subscription products that target varying segments of the retail investing public. The Company has reported improving metrics for its B2C subscription business over the last few quarters including an increase in new orders, average price, bookings, conversion and renewal rates. The Board will also continue to explore strategic alternatives for its consumer business.

The Company also expects to reduce its public company costs and corporate overhead following closing of the sale of its B2B Business given the reduction in overall headcount and operations. With that in mind, David Callaway, the Company's current Chief Executive Officer, has announced his intention to resign following the completion of the transaction. The Company will then be led by Eric Lundberg as Chief Executive Officer, who will also continue his role as Chief Financial Officer, and Margaret de Luna, current President of the Company's consumer business, who will assume the role of President and Chief Operating Officer.

Jim Cramer, Founder and Director, remarked, "The Company is in a better place since Dave took over and we thank him for his contributions and efforts. I have full confidence in Eric and Margaret's ability to manage the consumer business on a standalone basis and I look forward to continuing to build upon our recent success while the Board explores strategic opportunities for the Company."

The sale of the B2B Business is subject to the approval of a majority of the outstanding shares of common stock in TheStreet under Delaware law and is expected to be submitted for stockholder approval in the first quarter of 2019. No other regulatory approvals are expected to be required to complete the transaction and no dissenters or appraisal rights are triggered by the transaction.

Moelis & Company LLC acted as the sole financial advisor to TheStreet on the transaction. Orrick, Herrington & Sutcliffe LLP acted as legal advisor to TheStreet.

**The Proxy Omits Material Information**

25.     On December 31, 2018, Defendants filed a materially incomplete and misleading Proxy with the SEC.  The special meeting of TheStreet stockholders to vote on the Proposed Transaction is forthcoming.  The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it

did not contain any material misrepresentations or omissions. However, the Proxy misrepresents or omits material information that is necessary for the Company's shareholders to make an informed voting decision in connection with the Proposed Transaction.

26.     First, the Proxy fails to provide enough information regarding financial projections for the Company. In particular, the Proxy fails to disclose: (i) TheStreet's projected unlevered free cash flows and its underlying line items; (ii) all line items used to calculate TheStreet's non-GAAP EBITDA and segment EBITDA; (iii) a reconciliation of all non-GAAP to GAAP metrics; and (iv) TheStreet's estimate of EBITDA for the B2B Business in fiscal year ending December 31, 2023. *See* Proxy at 33-35, 40.

27.     Investors are concerned, perhaps above all else, with the projections and cash flows of the companies in which they invest. Under sound corporate finance theory, the market value of a company should be premised on the expected unlevered free cash flows of the corporation (the "Cash Flow Projections"). Accordingly, the question that the Company's shareholders need to answer in determining whether to vote in favor of the Proposed Transaction is clear: Is the Purchase Consideration fair compensation given TheStreet's projected cash flows? Without TheStreet's Cash Flow Projections for the years 2017 to 2022, the Company's shareholders will not be able to answer this critical question and assess the fairness of the Purchase Consideration.

28.     Defendants elected to summarize the projections for TheStreet on pages 34 and 35 of the Proxy. However, the EBITDA projection metrics that were included in the Proxy are not sufficient analogues for the Cash Flow Projections.

29.     Warren Buffet and other financial experts have observed the folly in emphasizing EBITDA over free cash flow: "Too many investors focus on earnings before interest, taxes, depreciation, and amortization. That makes sense, only if you think capital expenditures are funded

by the tooth fairy."[2]

30.     Indeed, relying solely on EBITDA to provide a fair summary of a company's financial prospects has numerous pitfalls.  EBITDA does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs that are critical to understand a company's value.[3]  As a result of these material differences between EBITDA and unlevered free cash flows, experts recognize unlevered free cash flows as a much more accurate measure when it comes to analyzing the expected performance of a company.

31.     In light of the significant differences between free cash flow and the projected metrics that Defendants elected to disclose in the Proxy—namely, EBITDA—the tables on pages 34 through 35 of the Proxy are materially incomplete and misleading.

32.     If a Proxy discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. Accordingly, Defendants have disclosed some of the projections relied upon by Moelis, but have omitted the Cash Flow Projections. Thus, Defendants' omission renders the projections disclosed on pages 34-35 misleading.

33.     With respect to Moelis' *Discounted Cash Flow Analysis*, the Proxy is also materially misleading and incomplete because it fails to disclose the inputs and assumptions underlying the selection of the range of discount rates from 12.0% to 16.0% (*i.e.*, the components of TheStreet's weighted average cost of capital for its B2B Business) and the inputs and assumptions underlying the selection of the 8.5x to 10.5x terminal multiples.  *See* Proxy at 41. Moreover, Moelis'

---

[2] Elizabeth MacDonald, *the Ebitda folly*, FORBES (March 17, 2003), http://www.forbes.com/global/2003/0317/024.html.
[3] Cody Boyte, *Why EBITDA is Not Cash Flow*, AXIAL FORUM (Nov. 19, 2013), http://www.axial.net/forum/ebitda-cash-flow/

*Discounted Cash Flow Analysis* is based on projections for the Company's expected financial performance during the year 2023. *See* Proxy at 41. However, the Proxy fails to disclose *any* financial projections for year 2023.

34. These key inputs are material to TheStreet shareholders, and their omission renders the summary of Moelis' *Discounted Cash Flow Analysis* incomplete and misleading. As one highly-respected law professor explained regarding these crucial inputs, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff explains:

> *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars*….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion* **unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices**. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added). Without the above-mentioned information, TheStreet's shareholders cannot evaluate for themselves the reliability of Moelis' *Discounted Cash Flow Analysis*, make a meaningful determination of whether the implied equity value ranges reflect the true value of the Company or was the result of an unreasonable judgment by Moelis, and make an informed decision regarding whether to vote in favor of the Proposed Transaction.

35. The Proxy also fails to disclose or misstate material information relating to the sale process leading up to the Proposed Transaction.

36. The Proxy fails to expressly indicate whether the confidentiality and non-solicitation agreements ("NDAs") entered with various bidders contained standstill provisions that are still in effect and/or "don't-ask-don't-waive" standstill provisions that are presently precluding these parties from making a topping bid for the Company. *See* Proxy at 23. In fact, some NDAs "in some instances, included a standstill agreement[s]", yet shareholders are not told which ones and its terms. *Id.* Such information is material to Plaintiff and TheStreet stockholders as a reasonable stockholder would find it material and important to their voting decision whether or not parties that had previously been interested in a potential acquisition of the Company are now foreclosed from submitting superior proposals.

37. Defendants failure to provide the foregoing material information renders the statements in the Proxy false and/or materially misleading.

38. In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the upcoming shareholder vote concerning the Proposed Transaction, Plaintiff will be unable to make an informed decision regarding whether to vote their shares in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 )**

39. Plaintiff incorporate each and every allegation set forth above as if fully set forth herein.

40. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission

may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

41. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

42. The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

43. Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for TheStreet; and (ii) the valuation analyses performed by Moelis in support of its fairness opinion.

44. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

45. The Individual Defendants knew or were negligent in not knowing that the Proxy

is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Moelis reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by Moelis, as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Purchase Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review Moelis' analyses in connection with their receipt of the fairness opinions, question Moelis as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

46. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Purchase Agreement and preparation and review of the Company's financial projections.

47. TheStreet is also deemed negligent as a result of the Individual Defendants'

negligence in preparing and reviewing the Proxy.

48. The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

49. Plaintiff incorporate each and every allegation set forth above as if fully set forth herein.

50. The Individual Defendants acted as controlling persons of TheStreet within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of TheStreet, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

51. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

52. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act

violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

53. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Purchase Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

54. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

55. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

56. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B. Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 10, 2019                    **Monteverde & Associates PC**

By: */s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel:(212) 971-1341
Fax:(212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*